[Civ. No 13934.   First Dist., Div. One.   Aug. 19, 1949.]

JEANETTE GLUCKSTEIN, Respondent, v. PHILLIP J. LIPSETT, M. D., Appellant.

Robert L. Lamb, Peart, Baraty & Hassary, Geo. A. Smith and Alan L. Bonnington for Appellant.

Melvin M. Belli and F. A. Devlin for Respondent.

BRAY, J.—In a malpractice action, plaintiff recovered a judgment entered upon a jury verdict, against defendant Phillip J. Lipsett, in the sum of $115,000, from which judgment defendant appealed.

## CONTENTIONS

1. Evidence is insufficient to justify the finding of malpractice. 2. Evidence is insufficient to sustain the amount of the verdict. 3. Error of court in permitting plaintiff to read from a medical textbook. 4. Alleged misconduct of counsel for plaintiff and one of his witnesses. 5. Error in refusing three proposed instructions.

### 1. EVIDENCE SUFFICIENT TO PROVE MALPRACTICE

In view of the many times the appellate courts have referred to the rule which binds them in considering the sufficiency of the evidence in the trial court, it hardly seems necessary to reiterate that rule here. However, in view of the fact that the determination of the principal issues in the case depends in large degree upon the credibility of the testimony of Dr. Smith, a plaintiff's witness, as opposed to that of defendant, it probably is better to refer again to the rule binding this court: "When a judgment is attacked as being unsupported by the evidence, the power of the appellate court in passing on this question begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the verdict rendered by the jury; and on appeal from a judgment for defendant in an action for damages for negligence, all conflicts in the evidence must be resolved in favor of the defendant, and all legitimate and reasonable inferences indulged in to uphold the judgment, if possible; and when two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the jury. (*Crawford* v. *Southern Pac. Co.,* 3 Cal.2d 427 [45 P.2d 183].)" (*Arundel* v. *Turk,* 16 Cal.App.2d 293, 295 [60 P.2d 486]; see, also, *Fischer* v. *Keen,* 43 Cal.App.2d 244 [110 P.2d 693]; 2 Cal.Jur. § 543, 921.)

Plaintiff, a woman 50 years of age, a subject of England, where she is in business as a dress designer, contacted defendant, a medical doctor, concerning plastic surgery to her breasts and abdomen. Defendant examined her and found that her breasts were pendulous and her abdomen large, with an old scar from prior operations. For the sum of $2,000, to include hospital expenses, he agreed to raise her breasts, and

remove the scar and excessive skin on her abdomen. Plaintiff testified that defendant looked at her body and said, "I could make a perfect job of that"; that the required operation could have no ill effects, and could not give rise to pain, discomfort, lumps or cancer in the breast.

Plaintiff entered the hospital on July 2, and was operated by defendant the next day under general anaesthetic. She testified that when she returned to the room she was in terrific pain. Drugs were given her to quiet the pain. On July 7, she was again operated by defendant, this time under a spinal anaesthetic. She testified that on her return from surgery this time she was likewise in terrific pain and was very ill. She remained in the hospital until July 19, when a hospital attache informed her that her bill had reached the sum of $500, which was the limit the hospital had been informed defendant would pay, and from then on she would be expected to pay all hospital expenses. She then removed to a hotel, although she claims she did not feel well enough to leave. She was in bed at the hotel off and on for a week. She then called another doctor to treat her. She testified that she had a "tightness below the belt, right in the waistline and I could not breathe properly."

Prior to defendant's surgery she had no lumps in her breast. After it a small lump on the left and a large one on the right gradually developed. The pain from the latter was terrific until a doctor on two occasions within six weeks of the trial had removed the fluid from it. The pain from it is constant. In the hospital after the second operation, while defendant was dressing plaintiff's wounds, a nurse stated to defendant that plaintiff's nipples were too high, and that one breast was larger than the other; that the breasts looked "terrible." Defendant took the nurse out of the room.

Photographs taken of plaintiff's breasts and abdomen before the defendant's surgery and after were exhibited to the jury. Also plaintiff herself, in the nude, was exhibited. From the photographs and from the other evidence appearing in the record, the jury well could have found that there is definitely a disfigurement of plaintiff's body; that there is an ugly, wide, jagged scar extending from the pubes to a point several inches above the waistline; that her abdomen area is distorted to the left; that one of her breasts is considerably larger than the other; that just above the lower edge of her left breast there is an ugly, long and wide scar; that there

is a similar scar on the lower edge of her right breast, which, however, being under the breast, is not so visible as that on the other breast; that her nipples are considerably above their normal position on the breasts and out of line, giving her breasts a most unusual, even ludicrous appearance; that the scars, the distortion of the body and the peculiar position of the nipples, give plaintiff a grotesque appearance.

The law of malpractice is well stated in *Hesler* v. *California Hospital Co.*, 178 Cal. 764, 766 [174 P. 654] : " ' 'A physician and surgeon, by taking charge of a case, impliedly represents that he possesses, and the law places upon him the duty of possessing, that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery. Upon consenting to treat a patient, it becomes his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge.' (*Pike* v. *Honsinger*, 155 N.Y. 209 [63 Am.St.Rep. 655, 49 N.E. 762].) 'The difficulties and uncertainties in the practice of medicine and surgery are such that no practitioner can be required to guarantee results, and all the law demands is that he bring and apply to the case in hand that degree of skill, care, knowledge, and attention ordinarily possessed and exercised by practitioners of the medical profession under like circumstances.' (*Zoterell* v. *Repp*, 187 Mich. 330 [153 N.W. 695].) ' '

The test to be applied by the jury is set forth in *Thomason* v. *Hethcock*, 7 Cal.App.2d 634, 636 [46 P.2d 832] : ''. . . the question which the jury must ultimately decide is not whether the treatment administered is such as would be commonly adopted and administered by doctors of ordinary skill in the use of ordinary care, but that the ultimate question is whether the treatment administered or the method used, whether a common method of treatment or not, was such, or was given in such a manner as indicated, suggested or demonstrated a lack of that care, training and skill which is ordinarily possessed by physicians and surgeons practicing in the same or similar communities.''

Applying such test to the evidence in the case at bar, there is substantial evidence (1) that the method adopted

by defendant was not that commonly adopted by doctors of ordinary skill, and (2) even if it was, it was administered in such a manner as to demonstrate a lack of ordinary care and skill. On the first question, Dr. Smith testified that in the abdomen "too much fat was cut away"; that it was cut away when the proper method would have been to tear it away; that cutting left "minute adhesions, maybe 500 of them." (Defendant testified that he applied "several hundred ties on the breasts or over the breasts, to stop the bleeding and the oozing.") Dr. Smith stated that he did not know why the abdomen scar was "ever produced that way"; that it was not good plastic surgery. As to the breasts, he testified that he did not know "what was to be accomplished" by the surgery performed there; that it "accomplished absolutely nothing, in opening the breast that way. There is no molding of the breast afterward. . . . She just has a couple of bags of degenerative fascia now." It helped "to shut off more of the circulation of the nervous system" and "prevents the lacteal fluid from the breast from circulating through." The jury were entitled to conclude from Dr. Smith's testimony that the *method* used by defendant was not a proper one. No medical men were called by defendant, and even he did not testify that the method he used was one used by other doctors, other than that there were sixteen or eighteen ways to do breast surgery. "Every surgeon has his own little tricks about the operation." It was "my own operation that I have found by experience brings the best results."

2. Assuming that the method was proper, the results were such as to demonstrate a lack of care and skill on the part of defendant. In addition to Dr. Smith's testimony, the disfigurement of plaintiff demonstrates a lack of skill. Her appearance speaks for itself. It could not have been caused by merely an error in judgment, for which the cases hold a doctor cannot be held responsible. Only a lack of care or skill could bring about the repulsive condition shown by the photographs. The defendant practically admits this. He said, ". . . it is, yes, the worse result I have gotten." ". . . at the time we do this operation, you estimate the amount of skin to be removed, and the amount of fat, and the position of the breasts, and I figured incorrectly . . ." "I could do a better job." "I am not satisfied with the result."

At defendant's request, plaintiff submitted herself to examination as to "the appearance of the operation" by Dr. George Warren Pierce, plastic surgeon. He did not tes-

tify, however. The jury were entitled to infer from this fact, coupled with their own observation of plaintiff's appearance, that the reason he was not called to testify was that his testimony might have been adverse to defendant. There was ample evidence to sustain the jury's implied finding that defendant was guilty of malpractice.

2. THE AMOUNT OF THE VERDICT

One hundred and fifteen thousand dollars is a considerable sum of money. It is difficult, however, for anyone to evaluate the damages caused to a woman from such mutilation of her body as appears here. She must necessarily suffer considerable humiliation, even though her disfigurement may be concealed by her clothing; and of course, humiliation is compensable. In addition, plaintiff testified that she suffers from a tightness across the waist, causing her to be very nervous and uncomfortable, with a feeling of wanting air, and that when she turns over in bed she feels that her stomach is drawing to one side. She also claims to suffer constant pain. Defendant testified: "There is no question she has pain." We are not required to pass upon the question of whether the three elements, constant pain, humiliation, and disfigurement, alone justify the amount of the verdict, for, added to these, there is evidence that, as a result of defendant's surgery, plaintiff has a malignant growth in her breasts. Defendant admits that there is a small "nodule" in her left breast, while in her right breast there is a larger nodule. These he testified were caused by clogged lacteal ducts. Dr. Pflueger, a witness called by plaintiff, testified that the lump in the right breast was about 2 inches in diameter, which he advised should be removed. Dr. Smith testified that in his opinion these lumps were malignant, and that there was only one thing to do, "Tear both breasts off and dissect the lymphatic system under each arm. She might live a year and a half or two years and she might not live that long." He made no tests to determine if the growths were malignant, contending that no such tests are available until the malignancy had attained a larger growth.

Defendant contends that the evidence does not show that the claimed malignancy resulted from the operation. It is true that the evidence on this subject is not as direct as it might be. Plaintiff's breasts contained no nodules before defendant's surgery. Defendant testified that the nodules were caused by the operation, "very probably a reaction to a tie around the vessels and her tissues, and it has formed a little

scar tissue around it'' and that they were fibrous as a result of the scar tissue. Dr. Smith testified, when asked the cause of the nodules, ''She has got a malignancy. Q. Why do you say that? A. Why do I say that? Q. Yes. A. Well, my experience for fifty years in general medicine and surgery, the acute pain, the sagging of the breasts, and then the pulling up of the nipples. There was that strain on the whole breast system. The breast is the second organ of the body that is susceptible to malignancy.'' This testimony sufficiently connects the malignancy to the operation, in spite of defendant's testimony that such an operation could not cause a malignancy.

As against the testimony of Dr. Smith, defendant relied solely on his own testimony that the growths were not malignant. No other medical men were called to give their opinion on the subject. He admitted that plaintiff had clogged lacteal ducts and pain extending from the lump'in her right breast under the axilla of her arm. It was his opinion that the lumps, the clogging of the lacteal ducts, and the pain, would all disappear in time. We cannot say that Dr. Smith's opinion that the lumps in plaintiff's breast are malignant is inherently improbable. It is a well known fact that a woman's breasts are peculiarly susceptible to malignancy, as Dr. Smith testified. It is unusual that in a case where the serious question of malignancy is raised, defendant made no effort to present impartial testimony upon the subject. The burden of proof, of course, of proving malignancy is on the plaintiff. She produced a licensed physician and surgeon, who, if believed by the jury, met that burden. To overcome his testimony defendant relied solely upon his own testimony. It was the jury's duty and province to weigh the testimony of the one against the other. Defendant's cross-examination of Dr. Smith was for the purpose of showing that he was a professional witness against doctors. The jury had the right to consider that fact, if it were a fact, against the very evident interest of defendant in the outcome of the case, and to determine which witness to believe. They believed Dr. Smith. For us to upset their determination of the issue of malignancy, we would have to hold as a matter of law that his opinion as a medical man is unworthy of belief, and that the probability of plaintiff having a malignancy is incredible.

Defendant argues that because Dr. Smith did not make any test of plaintiff for malignancy his opinion is reduced to that of a layman and that therefore the testimony of defendant as an expert must prevail. Defendant did not make any tests,

either, so it is not clear why his opinion, even though he examined plaintiff twice to Dr. Smith's once, has any greater foundation than that of the latter.

The test to be applied in cases where it is contended that the damages awarded are excessive was stated by us in *Buswell* v. *City & County of San Francisco*, 89 Cal.App.2d 123 [200 P.2d 115], to be (p. 127) "a comparison of the amount of the verdict with the evidence before the trial court." Taking into consideration the disfigurement, the humiliation, the pain and the malignancy, we cannot say that the award of $115,000, large as it is, is so far out of line as to show passion and prejudice on the part of the jury. It is not a question of what we would award (*Nason* v. *Leth-Nissen*, 82 Cal.App. 2d 70 [185 P.2d 880]), but whether we can hold that it indicates that type of action by the jury. "Generally speaking, . . . if there is substantial evidence in the record supporting the damages awarded by the jury and it is inferentially approved by the trial judge by his denial of a motion for new trial without reducing the damages, we are powerless to reduce them or to hold the award excessive." (*Holmes* v. *Southern Cal. Edison Co.*, 78 Cal.App.2d 43, 52 [177 P.2d 32].) In considering the amount of the verdict, we must bear in mind the present day situation as expressed in *Kircher* v. *Atchison, T. & S. F. Ry. Co.*, 32 Cal.2d 176, 187 [195 P.2d 427] : "It is a matter of common knowledge, and of which judicial notice may be taken, that the purchasing power of the dollar has decreased to approximately one-half what it was prior to the present inflationary spiral [Citing cases] . . ."

3. MEDICAL TEXTBOOK

Defendant's complaint is based on the following testimony: "Q. Now, Doctor, when we took your deposition, you expressed a familiarity with Thorek's 'Plastic Surgery of the Breast and Abdominal Wall.' A. Yes, I have read the book." At this point, plaintiff's counsel volunteered the statement that Thorek was the leading authority on this subject, which fact defendant later denied. "Q. . . . You are familiar with this book, aren't you? A. I have read the book. Q. Let me ask you, then, on page 359, with reference to scars and keloids, if you are not familiar with this paragraph by the author?" Defendant then objected, and the court overruled his objection. "MR. BELLI [counsel for plaintiff] : Q. The paragraph I refer you to, Doctor, is this: 'Any operation on the breast which subjects the patient to radial or longitudinal incisions

predisposes to more or less scarring. This should be avoided.'
Q. Do you agree with that? A. That is his opinion. Q. Do
you differ? A. No, it does not differ, but I don't know to what
he alludes in this particular case. Q. Let's read it again.
I will read you the last sentence of it here.'' Again defendant
objected and was overruled. ''MR. BELLI: Here is the last
sentence: 'Scars are constantly reminding the patient of the
operation which she has undergone, and should there be a
tendency to keloid formation, matters are much worse, be-
cause of the effects produced by the keloid.' . . . Q. You are
familiar with the book? A. I don't remember those things.
I have read the book, but I don't remember any particular
portion of it. . . . Q. Do you disagree with this particular
portion? A. No, I don't disagree with it.'' These questions
were preceded and followed by questioning of defendant con-
cerning the scars left by the operation.

The law in California on the subject of reading from text-
books on cross-examination is not well defined. There are
not many holdings and the dicta are somewhat inconsistent.
In the early case of *Gallagher* v. *Market St. Ry. Co.*, 67 Cal.
13 [6 P. 869, 56 Am.Rep. 713], the trial court had allowed
counsel to establish a textbook as a standard authority and
then read from it, as a means of presenting direct evidence.
On appeal the holding was that this was error; that medicine
not being an exact science, the contents of a recognized book
could not be prima facie evidence of facts of general notoriety
and interest under section 1936 of the Code of Civil Procedure.
In a dictum, however, the court stated: ''This as a general
rule is sustained by the great weight of authority; but it is
subject to this exception, namely, that books referred to by
an expert, to sustain the opinions which he has expressed, may
be used to contradict him or to discredit him.'' (P. 17.)

In *Fisher* v. *Southern Pac. R. R. Co.*, 89 Cal. 399 [26 P.
894], the trial court allowed, in cross-examination of an expert
witness, statements to be read from medical works and ques-
tions asked as to whether he agreed. On appeal, the court
held this error. It stated that the procedure was defended
on two grounds: (1) that the witness, on direct examination,
testified that his medical opinions conformed to the authority
of medical works, and it was argued that if a witness relies
in any manner upon the authority of medical works, generally
or specifically, it is proper cross-examination to confront him
with the works upon which he relies, to show that his under-

standing of them is incorrect, or to contradict him; and (2) that it is proper cross-examination to test the competency of the witness as an expert, or the value of his opinions. The court then said that the evidence showed (1) that the witness had not based his opinions on medical works, and (2) that the medical works were not inconsistent with the witness's testimony, and hence, the admission of the medical works upon either ground was error, ''though the legal proposition be admitted.'' (P. 407.) The concurring opinion did not agree with the majority statement that reading from medical books to test the competency of an expert or the value of his opinion, was a sound legal proposition.

In *Baily* v. *Kreutzmann,* 141 Cal. 519 [75 P. 104], the trial court had allowed an expert witness, on direct examination, to recite instances from medical treatises. The appellate court held this error, the opinion stating (pp. 521-522): ''It has been held, without conflict and in an extended line of cases in this state, that medical works are hearsay and inadmissible in evidence, except perhaps on cross-examination when a specific work may be referred to, it seems, to discredit a witness who has based his testimony upon it. . . . It must be taken as the settled rule in this state that medical books are not admissible as evidence, except in the instance already specified.''

The above language was pure dictum, as it refers to a purported rule on cross-examination, while the testimony given was on direct examination. In *Griffith* v. *Los Angeles Pacific Co.,* 14 Cal.App. 145 [111 P. 107], a physician in giving his opinion did not refer to any medical work, but stated that he had not heard or read of a similar case to the one he treated. On cross-examination he was asked if a certain medical work did not contain a certain statement. The appellate court upheld an objection to the question on the ground that as he had not referred either generally or specifically to a medical work, any statements in such a work would not be a contradiction of his testimony. The court referred to the rule as follows: ''The rule affecting the examination of an expert medical witness, which permits a showing of the contents of the books of standard authors skilled in that particular profession, is limited. It is permissible only to show what such authors have declared upon a subject, when a witness has based his opinion wholly or in part upon his reading of books of that character (*Fisher* v. *Southern Pacific R. Co.,* 89 Cal.

399 [26 P. 894] ; *Lilley* v. *Parkinson,* 91 Cal. 655 [27 P. 1091] ),
and then only when statements found in such books are not
in harmony with the testimony of the witness.'' (P. 147.)
This decision disapproves the second ground of admissibility
suggested in the Fisher case, *supra* (to test the witness's com-
petency).

In *People* v. *Hooper,* 10 Cal.App.2d 332 [51 P.2d 1131],
a handwriting expert was asked a question on cross-examina-
tion touching his familiarity with a certain printed work on
the subject of handwriting. The court held (p. 335) : ''While
it is the general rule that the contents of printed books may not
be brought before the jury upon examination of an expert
witness, upon the theory that such action violates the hearsay
rule and permits a person not under oath and not subject to
cross-examination to place his opinions before the jury (*Baily*
v. *Kreutzmann,* 141 Cal. 519 [75 P. 104] ), the rule is other-
wise upon cross-examination where, as here, the witness has
testified that he relies upon certain works, or where the pur-
pose is to test the competency of the expert. (*Fisher* v. *South-
ern Pacific Co.,* 89 Cal. 399 [26 P. 894].)''

In *Lewis* v. *Johnson,* 12 Cal.2d 558 [86 P.2d 99], an expert
witness had testified that he based his opinion partly on a
certain textbook, but the trial court refused to allow impeach-
ing questions on cross-examination based on it. The Supreme
Court held (p. 562) : ''This was improper, for the rule against
admission of such works as direct evidence is subject to the
qualification that textbooks relied upon by an expert witness
may be used as a foundation of impeaching cross-examination.
[Citing cases from other jurisdictions.]''

The general rule in other jurisdictions as to the non-
admissibility of medical books on direct examination is the
same as that in California—they are not admissible. The gen-
eral rule on their admissibility on cross-examination where the
witness either on direct or cross-examination has based his
opinion either generally or specifically on a medical work or
medical works, is the same as that shown by the foregoing
cases to be the rule in this state, namely, they are admissible.
However, on the question of their use in cross-examining an
expert witness who does not base his opinion on authority, the
decisions elsewhere are in conflict, some taking the view that
counsel may refer to the authorities for the purpose of testing
the knowledge of the witness or discrediting his testimony,
and others denying the right. (82 A.L.R. 440.) California,

it appears from the cases above mentioned, does not permit the use of medical books on this latter ground.

In our case, the defendant's testimony showed that he did not base his opinion on medical books, either generally or specifically, and therefore it was error to permit the reading of the extracts from Thorek. However, it was error without prejudice, as the extracts were in no way contradictory of defendant's testimony. Both he and Thorek agreed that scars would result from an operation on the breast. Moreover, defendant testified that he did not disagree with the quoted portions.

4. ALLEGED MISCONDUCT

Defendant in cross-examining Dr. Smith brought out the fact that for about 28 years he had been testifying in malpractice cases against doctors, and then the following occurred: "Q. And in these cases against doctors in brain cases, legs, and most everything that comes along, is that correct? A. Yes. We had one case in Stockton a little while ago—twenty-seven doctors, in Stockton, and the poor boy that lost his arm, they couldn't get one doctor to say a good word for him, not one doctor. They were all told if they testified their insurance would be cut off. MR. LAMB [counsel for defendant] : I assign that as prejudicial misconduct and not responsive. He is not my witness, your Honor. THE WITNESS: You accuse me of—— THE COURT: Wait a minute, wait a minute. Q. Doctor, I am just asking you a few questions. . ." and proceeded with the examination. It is obvious that defendant did not give the court a chance to rule or to admonish the jury. It is also obvious that the witness was a bit anxious to volunteer statements which he thought would help the plaintiff's case. The failure of the defendant to ask for a ruling on his assignment of misconduct would indicate that he did not consider it particularly serious at the time. Also he should have asked that the testimony be stricken from the record, as was done in *Packard* v. *Moore*, 9 Cal.2d 571 [71 P.2d 922]. We cannot assume that as the statement was volunteered in answer to a question by defendant, plaintiff's counsel was responsible for the answer. As said in *Packard* v. *Moore, supra* (p. 580) : "The case in our opinion is governed by the decision in *Hughes* v. *Quackenbush,* 1 Cal.App.2d 349, 358 [37 P.2d 99, 103], where the court states the proper rule as follows: 'While courts have condemned repeatedly attempts to bring before a jury the fact that insurance exists, their condemnation extends only to cases where there is an "avowed purpose and

successful attempt'' to bring the fact before the jury. It does not extend to cases where the information comes in, incidentally, in attempting to prove other facts, or where the record does not show that the particular answer was sought or anticipated.' '' It is not reasonable to assume that the verdict would have been any different if the witness had not made this statement.

The same is true of the alleged misconduct of plaintiff's attorney. This consisted of the following: ''MR. BELLI [questioning Dr. Smith]: Q. Do you know of a rule of the San Francisco Medical Society and the Alameda County Medical Society, with reference to one doctor testifying in a malpractice case against another doctor? A. Yes.'' Defendant's objection to this question was sustained by the court. Mr. Belli then asked: ''That is the one with reference to the rule of the Medical Society, your Honor? THE COURT: Yes.'' Defendant on recross-examination asked Dr. Smith if he belonged to the Alameda County Medical Society. He replied that he had never joined any organization in his life. On further redirect examination the following occurred: ''MR. BELLI: Q. Doctor, if you did belong to either of those societies, under the ethics of those societies, would you be permitted to testify in court against another doctor, under oath? A. No. MR. LAMB: I object to the form of that question. THE COURT: I will sustain the objection. That clearly calls for his conclusion. MR. BELLI: I don't want to persist, your Honor, but in view of Mr. Lamb's questions, I would like to ask further if he is familiar with the rule of the County Medical Society. THE COURT: There is a way to prove that. You cannot prove it by hearsay. MR. BELLI: Q. Do you know the custom? A. Yes. MR. LAMB: The same objection. THE COURT: Same ruling.'' Defendant did not request an instruction to the jury on the subject. ''Where remarks of counsel are not assigned as error and where no request is made for an instruction to disregard them, usually the error, if any, cannot be urged on appeal. [Citing cases.]'' (*Wills* v. *J. J. Newberry Co.*, 43 Cal.App.2d 595, 607 [111 P.2d 346].) Moreover, so far as the questions on further redirect examination are concerned, the only objection was as to the form of the questions.

''There is another rule which has become well established that has an important bearing on whether or not we must regard the misconduct as prejudicial and a ground for reversal of the judgment. It is thus restated by the Supreme

Court in *Mudrick* v. *Market Street Ry. Co.,* 11 Cal.2d 724 [81 P.2d 950, 118 A.L.R. 533]:

" 'Respecting the misconduct of counsel occurring during the trial and while he was cross-examining witnesses, the defendants cite us to five separate occasions in which they claim that counsel transgressed the rules of propriety. . . . The situation before us is much like that which confronted this court in a former case in which it was said: ''The trial court denied a motion for a new trial based upon the ground, among others, of misconduct of plaintiff's attorneys. In doing this the court must be deemed to have concluded that no prejudice was suffered by defendant by reason of any of the matters to which we have referred. Conceding some of the statements made by counsel, whatever the provocations thought by him to exist therefor, were improper, we are satisfied that this conclusion of the trial judge should not be disturbed by an appellate court. The trial judge is in a much better position than an appellate court to determine whether the verdict in a case is probably due wholly or in part to such alleged misconduct as we have here, and his conclusion in the matter should not be disturbed unless, under all the circumstances appearing it is plainly wrong. This we think may not fairly be said here.'' (*Lafargue* v. *United Railroads,* 183 Cal. 720, 724 [192 P. 538].)' " (*Wills* v. *J. J. Newberry Co., supra,* pp. 607-608.) (See, also, *Cope* v. *Davison,* 30 Cal.2d 193 [180 P.2d 873, 171 A.L.R. 667].)

### 5. INSTRUCTIONS

▮▮▮ Defendant offered, and the court did not give, an instruction to the effect that questions of the jurors on *voir dire* concerning their possible interest in any insurance company was merely for the purpose of determining their frame of mind and that "no insurance company is a party to this action or interested therein." Defendant contends that the refusal to give this instruction was error. It has been held frequently that an instruction that no insurance company is a party to the action is a proper instruction where the jurors were asked concerning possible interest in such a company. However, in *Bennett* v. *Chandler,* 52 Cal.App.2d 255 [126 P.2d 173], one of the cases cited by defendant, it was held that the failure to give the instruction is not error. The court said (p. 264): "In each of the cited cases the trial court gave the instruction requested after certain claimed improper questions were propounded which subtly intimated the

existence of insurance in the case. It was there held that the giving of the instruction was proper. In the instant case there was no showing that the questions were improper or that appellants were entitled to an instruction that no insurance company was a party to the action. [Citing case.] Appellants must show that they were prejudiced by the omission to give any instruction. [Citing cases.]"

The record in our case fails to show the examination of the jurors, so we do not know whether they were asked questions concerning insurance. But assuming that they were, the failure to give this instruction is not error particularly as the proposed instruction contained the phrase "or interested therein." The court would have no way of knowing whether an insurance company was interested in the case. To instruct to this effect, the court must assume a fact which may or may not be true. The proper instruction in this regard would be, in addition to stating that no insurance company is a party to the action, to call the jury's attention to the fact that they are not to speculate upon the question of whether defendant is or is not insured, as that question has no bearing whatever on any issue in the case. (See *Shriver* v. *Silva,* 65 Cal.App.2d 753, 761 [151 P.2d 528].)

The second and third instructions complained of were to the effect that a surgeon is not a warrantor of cures, and that a mere mistake or error in judgment on defendant's part does not entitle plaintiff to recover if defendant exercised the ordinary care, learning and skill used by practicing surgeons in similar localities. Aside from the question of whether the word "cures" applies to the results defendant was attempting to effect in this case, these instructions are proper statements of the law. However, there was no error in failing to give them, as their subjects were well covered in the many other instructions given by the court. The court fairly and fully instructed at some length upon the standard of care required, the difficulties and uncertainties in the practice of surgery, and the fact that "no practitioner can be required to guarantee results."

Judgment affirmed.

Peters, P. J., and Ward, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 17, 1949. Shenk, J., voted for a hearing.