[Civ. No. 17045. First Dist., Div. One. Oct. 22, 1957.]

OLGA SALGO, as Administratrix, etc., Respondent, v. LE-LAND STANFORD JR. UNIVERSITY BOARD OF TRUSTEES et al., Appellants.

*Assigned by Chairman of Judicial Council.

Joseph F. Rankin, Peart, Baraty & Hassard, George A. Smith and Richard G. Logan for Appellants.

Thomas J. Cunningham, Mark Owens, Jr., Lawrence Howe, Jr., Paul G. Gebhard and Vedder, Price & Kaufman as Amici Curiae on behalf of Appellants.

Fitz-Gerald Ames, Sr. and George Olshausen for Respondent.

Melbert B. Adams, Ashe & Pinney, Richard A. Bancroft, Robert D. Barbagelata, Frank J. Baumgarten, Philander Brooks Beadle, Melvin M. Belli, Marion P. Betty, James F. Boccardo, Andrew Bodisco, Harold C. Brown, Lionel T. Campbell, Victor E. Cappa, R. A. Carmazzi, Ben C. Cohen, Nathan Cohn, George F. Cooke, Albert E. Deasy, J. N. Nick DeMeo, Louis F. DiResta, J. J. Doyle, A. Don Duncan, Ernest E. Emmons, Jr., Andrew J. Eyman, Jack Flinn, Leo Fried, Myron L. Garon, Charles R. Garry, Richard F. Gerry, Emmet Hagerty, Michael L. Haun, Hirson & Horn, Newell J. Hooey, Theodore A. Horn, Vernon W. Humber, Ralph Leon Isaacs, Carroll F. Jacoby, William A. LaHanier, Leland J. Lazarus, Lenz, Jarvis, Miller & Decker, Lewis E. Lercara, Edward Levin, Mildred W. Levin, Morris Lowenthal, Paul E. Madden, Joseph F. Mannion, Jack G. McBride, Malcolm N. McCarthy, Francis J. McTernan, Jr., Robert C. Mires, Charles P. Molinari, Jackson E. Nichols, Oliver, Good & Sloan, Myer M. Penn, W. M. Pinney, Jr., Edward I. Pollock, Pollock & Pollock, James P. Preovolos, James C. Purcell, James J. Reilly, Michael Riordan, Harry C. Rogers, Samuel A. Rosenthal, Maurice C. Ryan, Thomas C. Ryan, Eugene E. Sax, Roy A. Sharff, Morton L. Silvers, Albert F. Skelly, Albert F. Taddeucci, Bergen Van Brunt, Anne Varakin, Jack H. Werchick, Ralph Wertheimer and Arthur C. Zief as Amici Curiae on behalf of Respondent.

BRAY, J.—In a malpractice action the jury awarded Martin Salgo[1] the sum of $250,000 against defendants Leland Stanford Jr. University Board of Trustees, Stanford Uni-

---

[1]Subsequent to the judgment Martin Salgo died and his widow as administratrix was substituted as plaintiff. Wherever the word "plaintiff" appears in this opinion, it refers to the deceased.

versity Hospitals,[2] and Dr. Frank Gerbode. The trial court reduced the award to $213,355. All defendants appeal from the judgment entered thereon.[3]

## QUESTIONS PRESENTED

1. Was res ipsa loquitur applicable, and if so, were the instructions thereon proper?[4]

2. Liability of Dr. Gerbode for negligence of hospital team.

3. Instructions on alleged other negligence of defendant Gerbode.

4. Experimentation and the manufacturer's brochure.

5. Instructions on (a) duty to call specialist; (b) physician's duty to disclose; (c) failure to produce evidence.

6. Medical texts as evidence.

7. Reference to malpractice judgments.

## EVIDENCE

Dr. Gerbode has been licensed to practice medicine in California since 1937. He specializes in surgery, surgery of the heart, major vessels, and in thoracic surgery, with a special interest in cardiovascular surgery. He is recognized as an outstanding authority and is a professor of surgery at Stanford Medical School. Plaintiff was 55 years of age, with a history of eye condition indicating premature aging. About two or three years prior to the occasion upon which this suit is based, he had developed cramping in his legs upon walking and for approximately a year had been treated with drugs by a physician. This doctor referred him to Dr. Gerbode as a specialist in the surgical treatment of arterial diseases. December 31, 1953, at Stanford Hospitals, Dr. Gerbode examined plaintiff. His chief complaint was cramping pains in his legs, mostly in the calves, causing intermittent limping. This condition had started gradually, becoming increasingly more

---

[2]The Stanford Board of Trustees and Stanford University Hospitals are one entity. The entity owns and operates the Stanford University Hospitals in San Francisco and will hereafter be referred to as Stanford Hospitals.

[3]An amicus curiae brief on behalf of the defendants was filed by the Regents of the University of California and one on behalf of Dr. Gerbode was filed by the American College of Surgeons.

[4]As will hereafter appear, the judgment must be reversed because of error affecting all defendants, namely, improper instructions on res ipsa loquitur. For the guidance of the trial court at the retrial we are considering herein some of the questions raised on this appeal without designation of whether they are raised by all or merely one of the defendants. We do not deem it necessary to discuss all of the questions raised on this appeal, particularly those dealing with other theories of negligence than those discussed herein.

severe. He complained of pain in his hips and lower back on exercise. He also had right side abdominal pain. Dr. Gerbode's examination found a man who looked much older than his stated age. Both legs were atrophic in the thighs and calves. The right leg was blue. No pulses below the femoral pulse on each side were palpable. There was a weak femoral pulse on the left and none on the right. Upon raising the legs they blanched. This is a characteristic of advanced arterio insufficiency. Dr. Gerbode then diagnosed a probable occlusion of the abdominal aorta which had impaired the blood supply to the legs and other areas and an advanced arteriosclerosis. Dr. Gerbode was uncertain whether the decreased circulation was limited to the legs alone, or to something blocking the blood higher up. Plaintiff's blood pressure was 180/90, which Dr. Gerbode felt was due to the generalized arteriosclerosis. The latter is a serious disease and one which might cause a stroke in the brain or a coronary occlusion to the vessels of the heart.

Dr. Gerbode advised plaintiff that he had evidence of serious circulatory disturbance, that the examination indicated that plaintiff might have a block in his abdominal aorta, and that there was something else wrong as shown by the pain in his right side and back. Dr. Gerbode told plaintiff of the seriousness of his condition and that plaintiff should enter the hospital for a thorough evaluation of his condition; that one of the things the doctor wished to have done was a study of plaintiff's aorta, which would entail an anesthetic and an injection of some material in the aorta to localize the block; also X-rays of his gastrointestinal tract would be taken. Dr. Gerbode stated that if his clinical findings were borne out by the further examination contemplated his condition would be helped by an operation removing and replacing a segment of the aorta. Such an operation would improve the circulation to the legs and back and prolong his life. Dr. Gerbode did not explain all of the various possibilities to plaintiff of the proposed procedures but did say that his circulatory situation was quite serious. Dr. Gerbode reported to the referring physician and recommended the performance of an aortography in order to locate the block and its extent so that proper surgery could be done. A study of the gastrointestinal tract was also necessary. An aortography consists of injecting in the aorta an X-ray contrast medium and then taking X-ray pictures of the abdominal aorta and its branches to discover the block, if any.

At Dr. Gerbode's suggestion plaintiff entered the hospital on January 6, 1954. That afternoon Dr. Gerbode ordered, among other things, X-rays of the chest and abdomen after a barium swallow. The X-rays were taken and showed marked calcification in the abdominal aorta, iliac and femoral vessels. This presence of calcium indicated that the illness was of long duration. Dr. Gerbode requested in writing that the aortography be performed by the hospital's X-ray department.

The normal procedure is for the attending surgeon to tell members of the house staff team who are to perform the procedure basically what the problem is. Dr. Gerbode did this with Dr. Ellis and Dr. Andrews of the staff. Dr. Ellis was to perform the aortography. Dr. Ellis had five years practice in surgery and was in charge of all special diagnostic procedures at the hospital, such as aortographies, that had to do with the injection of radio-opaque or contrast material in various arteries and blood vessels of the body.

On January 7th Dr. Ellis called on plaintiff in his hospital room and informed him that he was to do the aortography and would do it the next afternoon. He explained that he would inject some material into the aorta and take films at that time to see if they could ascertain the precise condition of plaintiff's circulatory system. The next afternoon Dr. Ellis saw plaintiff and informed him that the procedure had been postponed until the following day because plaintiff still had some barium in his intestines from the first X-ray study.

On January 6th, Dr. Howard, an anesthetist, saw plaintiff and examined him to determine if he was fit to receive the anesthetic. When the procedure was postponed, Dr. Clark saw the patient on January 7th and informed him the procedure would take place on the next day.

On the afternoon of January 8th Dr. Ellis went to the X-ray room where plaintiff was lying on a table. Present were the anesthesiologist, Dr. Bengle, Dr. Andrews, a radiologist, and several technicians. Dr. Gerbode was there at the beginning of the procedure but gave no instructions and did not participate in the procedure. Plaintiff was already anesthetized and asleep. Dr. Ellis was inserting the needle in plaintiff's aorta when Dr. Gerbode came in the room. As the patient was apparently in good condition Dr. Gerbode left and did not see the patient again until the next morning.

An aortography is a procedure requiring an anesthesiologist, a radiologist and a surgeon. The function of the surgeon (Dr. Ellis) is to insert the needle necessary for the injection

of material into the aorta and to discuss with the radiology department the materials used and the timing. A hollow Number 16 or Number 18 needle is used. The hollow is closed with a metal rod or stylette. It is approximately 1/32nd inch in diameter and 6 inches long. The patient is placed on his abdomen, face down on the table, and given a general anesthetic. A sensitivity test is then done to determine if the patient is sensitive to the radio-opaque material to be used. The needle is inserted to the left of the spinal column approximately 3 to 4 inches to the left of the midline of the back underneath the 12th rib. The needle is inserted in an upward direction toward the front of the body so as to enter the aorta which lies in front of the spinal column. The material used here was 70 per cent sodium urokon. This under an X-ray will appear in contrast to the body tissues. One c.c. of it was injected into a vein in plaintiff's arm. He appeared not to be sensitive to it. After the surgeon feels the needle penetrate the wall of the aorta a metal rod is removed from the needle and blood flows from the aorta through the hollow needle. A syringe is then attached to the needle. In this case 30 c.c.'s of sodium urokon were then injected at a fairly rapid rate. Defendants' witnesses testified that there was no difficulty in inserting the needle on the first attempt and that it was only inserted once. (Plaintiff contends otherwise, as will hereafter appear.) The injection took only a few seconds and then a series of X-rays were immediately taken by a machine already in position. While the films were still wet Dr. Ellis and the radiologist, Dr. Stone, examined them. They showed that the descending aorta in the abdomen just below the vessels leading to the kidneys was blocked. In a consultation between Drs. Ellis, Stone and Andrews (another radiologist) it was deemed desirable to take additional X-rays in order to determine the extent or length of the block. During this time plaintiff was kept under anesthesia and the needle remained in place, it being the custom so to do while the doctors are determining whether additional X-rays are necessary. This obviates the necessity of again inserting the needle. The doctors hoped that by changing the timing of the pictures in relation to the time of making the second injection they might be better able to delineate the vascular tree. Twenty c.c.'s of sodium urokon were then injected, without changing the position of the needle, and additional X-rays taken, particularly of the body further down than in the first pictures. The entire procedure seemed to pro-

ceed in a normal manner, and the patient seemed that evening to have recovered from the anesthesia. At 5 o'clock Dr. Gerbode was informed by Dr. Ellis that the procedure had been routine and gone well. The next morning when plaintiff awoke he noticed that his lower extremities were paralyzed. This condition is permanent.

### 1. *Res Ipsa Loquitur.*

The court instructed that the doctrine applied. "If it did not, or if the instructions thereon were improper, the judgment will have to be reversed, even though there should be evidence of negligence of any or all defendants. (*Dees* v. *Pace,* 118 Cal.App.2d 284 [257 P.2d 756].)

The application of the doctrine of res ipsa loquitur in malpractice cases is a development of comparatively recent years. Before that time, the facts that medicine is not an exact science, that the human body is not susceptible to precise understanding, that the care required of a medical man is the degree of learning and skill common in his profession or locality, and that even with the greatest of care untoward results do occur in surgical and medical procedures, were considered paramount in determining whether the medical man in a given circumstance had been negligent. But gradually the courts awoke to the so-called "conspiracy of silence." No matter how lacking in skill or how negligent the medical man might be, it was almost impossible to get other medical men to testify adversely to him in litigation based on his alleged negligence. Not only would the guilty person thereby escape from civil liability for the wrong he had done, but his professional colleagues would take no steps to insure that the same results would not again occur at his hands. This fact, plus the fact that usually the patient is by reason of anesthesia or lack of medical knowledge in no position to know what occurred that resulted in harm to him, forced the courts to attempt to equalize the situation by in some cases placing the burden on the doctor of explaining what occurred in order to overcome an inference of negligence. One other fact contributed to the application of the doctrine, namely, that certain medical and surgical procedures became so common that in many of them the laymen knew that if properly conducted untoward results did not occur,[5] and in others medical men

---

[5] Such a procedure is injection in the muscles of the arm. See *Bauer* v. *Otis,* 133 Cal.App.2d 439, 443-445 [284 P.2d 133].

(when it was possible to get them to admit it) from their specialized knowledge knew that without negligence the result would have been a good one.

The great difficulty in the application of the doctrine is to determine where to draw the line. To apply it in all cases where an unexpected result occurs would hamstring the development of medical science. No medical man would dare to use new procedures, especially in surgery, because if injury resulted he would be prima facie guilty of negligence. Medical science has developed in leaps and strides in the past few years. Procedures that 40 years or even 10 years ago, would have been considered impracticable and fatal are now being successfully used; for example, surgery upon the heart. Even the procedure used in this case, translumbar aortography where the aorta is punctured and a foreign substance injected in order to determine the location of a suspected block, is one which but a few years ago would not have been attempted but one which is of great value in determining whether or not corrective surgery is needed and advisable. Thus a great responsibility rests upon the courts—to determine the point at which the doctrine will apply in order to be fair to a patient who has received a result which either common knowledge of laymen or of medical men teaches ordinarily would not occur without negligence, and to be fair to the medical men if there is a result which could occur without negligence and which should not impose upon them the presumption of negligence.[6]

Cases in which the doctrine has been applied follow: *Ragin v. Zimmerman,* 206 Cal. 723 [276 P. 107][7], *Costa v. University of California,* 116 Cal.App.2d 445 [254 P.2d 85], and other California cases applying the doctrine to X-ray burns both in diagnosis and treatment; cases such as *Timbrell v. Suburban Hospital, Inc.,* 4 Cal.2d 68 [47 P.2d 737], dealing with burns by hot water bottles, hot compresses or heating pads; *Bauer v. Otis, supra,* 133 Cal.App.2d 439, injection in the arm

---

[6]See discussion in article ''California Malpractice,'' vol. 9, Stan.L. Rev., p. 737.

[7]The X-ray was used for diagnosis and not for treatment. From this fact plaintiff concludes that in every case of diagnosis, as distinguished from treatment, the doctrine applies. Thus, here, because the aortography was for diagnosis only, plaintiff contends the doctrine necessarily applies. The cited case does not so hold. There might have been more reason for advocating that as a rule some years ago when diagnosis did not as it does in many cases today and as it did in this case, include surgical procedures.

muscles; *Cavero* v. *Franklin Gen. Benevolent Soc.*, 36 Cal.2d 301 [223 P.2d 471], death of child during tonsil removal due to erratic and excessive administration of anesthetic.

In these cases application of the doctrine was denied: *Farber* v. *Olkon*, 40 Cal.2d 503 [254 P.2d 520], shock therapy; *Engelking* v. *Carlson*, 13 Cal.2d 216, 221-222 [88 P.2d 695], removal and transportation of ligaments in knee (this case was disapproved in *Seneris* v. *Haas*, 45 Cal.2d 811, 827 [291 P.2d 915, 53 A.L.R.2d 124]; *Dees* v. *Pace, supra*, 118 Cal.App.2d 284, hysterectomy; *Bennett* v. *Los Angeles Tumor Institute*, 102 Cal.App.2d 293 [227 P.2d 473], X-ray burns; *Pink* v. *Slater*, 131 Cal.App.2d 816 [281 P.2d 272], removal of scars.

A study of the cases both pro and con on the application of the doctrine in malpractice actions demonstrates that the doctrine is applicable only where it is a matter of common knowledge among laymen *or* medical men or both that the injury would not have occurred without negligence. (See *Seneris* v. *Haas, supra*, 45 Cal.2d 811, 824-825.) Plaintiff contends that there is an additional situation in which the doctrine will apply, namely, where the patient is under anesthesia and injury occurs, particularly to a different part of the patient's body than the one on which the work was to be performed, and that such application of the doctrine should be made here, because the aorta was the vessel involved and there was evidence that the spinal column was injured. Plaintiff cites *Dierman* v. *Providence Hospital*, 31 Cal.2d 290, 292 [188 P.2d 12], *Ybarra* v. *Spangard*, 25 Cal.2d 486, 490 [154 P.2d 687, 162 A.L.R. 1258], *Meyer* v. *McNutt Hospital*, 173 Cal. 156, 159 [159 P. 436], and *Bauer* v. *Otis, supra*, 133 Cal. App.2d 439. However, an examination of those cases shows that while at first blush it appears that it is the mere fact that the patient is under anesthesia that causes the doctrine to apply, actually it is not so, and the doctrine applies because the results were ones which either laymen or medical men know ordinarily do not occur without negligence. To apply the doctrine in every case merely because the patient is under anesthesia would put a hopeless burden on the medical profession. It must be remembered that the doctrine goes further than to require the doctor to explain what happened, as, of course, he will have to do to overcome the plaintiff's charge of negligence,—it infers that he was negligent.

There can be little question but that aortography and its results, because it is a relatively new diagnostic procedure, is not a matter of common knowledge among laymen. (Plain-

tiff contends and one of his witnesses testified that translumbar aortography was not used enough in the bay area to constitute routine procedure.) Very few laymen have ever heard of it. ■ So far as laymen are concerned, it cannot be said that it is a matter of common knowledge that injury results only where there has been negligence in its use. Particularly is this so, when it is performed upon a person with the advanced degree of arteriosclerosis possessed by plaintiff. It is a matter outside the realm of the laymen's experience, and hence common knowledge as a basis for the application of the doctrine does not exist. See *Dees* v. *Pace, supra,* 118 Cal.App.2d 284.

This brings us to the question of whether there was any professional evidence calling for the application of the doctrine. ■ Plaintiff's medical witness did not testify upon this subject, but all the witnesses agree that paralysis is a rare complication of aortography. This fact does not prove that it normally does not occur in the absence of negligence. "The mere fact in itself that an unfavorable result is somewhat rare does not give rise to" the inference of negligence. (*Dees* v. *Pace, supra,* 118 Cal.App.2d 284, 289.) None of the defendants' witnesses testified directly that the paraplegia would not occur without negligence. Dr. Wylie testified that there are risks attendant upon this procedure, that the risk of vessels constricting or occluding as the result of the drug used in the procedure is one of the risks which must be assumed and that there is little than can be done to guard against it. Dr. Naffziger testified that the risks had to be balanced against the importance to the patient of determining the exact diagnosis and the future treatment necessary.

■ With the exception of plaintiff's witness Dr. Edmeads, none of the experts could determine the exact cause of the paraplegia. In effect, they stated it might have been one of three: (1) constriction of the blood vessels in the spinal cord, due to the urokon; (2) direct damage to the spinal cord from urokon in the spinal cord circulation; (3) the plaintiff's condition, a partially blocked aorta, arteriosclerosis and high blood pressure of several years standing, obliteration of blood vessels and blood supply to legs, was such that sudden and total paralysis could occur at any moment. Their testimony was to the effect that the first two conditions could result from an aortography. Dr. Edmeads from an examination of the X-rays showing the needle in place at the times of

both injections, opined that the needle at the time of the second injection was near or in an artery supplying blood to the spinal column and that the urokon was injected thereby into the column, and that caused the paraplegia. Defendants disagreed with this diagnosis. There was no medical testimony upon which res ipsa loquitur could be based unless it be Dr. Edmeads' testimony that the needle may have been inserted in the wrong place. There was no testimony that in aortography, without negligence, a needle could be inserted in a spinal artery. In fact, the testimony was just to the contrary, that there should be no great difficulty in inserting the needle in the aorta. Dr. Edmeads' testimony, if believed, would bring the case within the rule of *Dierman* v. *Providence Hospital,* 31 Cal.2d 290, 292, *Ybarra* v. *Spangard,* 25 Cal.2d 486, 490, and *Meyer* v. *McNutt Hospital,* 173 Cal. 156, 159, all *supra,* that where a patient is under anesthesia and a different part of his body is injured than that which should have been involved in the procedure, and there is no evidence that such a result ordinarily might occur without negligence, the doctrine applies. See *Seneris* v. *Haas, supra,* 45 Cal.2d 811, 823: ". . . the jury, under appropriate instructions, should have been permitted to determine whether each of the conditions necessary to bring into play the rule of res ipsa loquitur were present. Here, there was a conflict in the testimony, defendants' experts testifying in effect that the urokon could have affected the spinal cord even if properly injected in the aorta and that such a situation might have occurred here; plaintiff's expert testifying in effect that the X-ray showed the needle to have been inserted in the wrong place. The jury were not told that the doctrine could apply only in the event they found that the needle had been inserted in the wrong place. On the contrary, the court instructed the jury that as *a matter of law,* from the "happening of all the events involved in this case, however, *as established by the evidence,"* (emphasis added) the inference of negligence arose. The jury were given no opportunity to determine the facts upon which the doctrine would or would not arise. This was prejudicial error.[8]

Although there was evidence on other theories of the case that would have supported the action of the jury, nevertheless

---

[8]As the case will have to be retried, we deem it advisable to point out, without determining the seriousness of such an error, that the words "evidence preponderates" in the last sentence of instruction No. 27 (res ipsa loquitur) is erroneous and should not be used.

the judgment will have to be reversed because of these prejudicial instructions, as there is no way of telling whether the jury decided as it did because of such improper instructions, or because negligence may have been proved otherwise.

2. *Dr. Gerbode's Liability.*

Assuming that there was negligence in the performance of the aortography, we find no evidence which would make Dr. Gerbode liable therefor in the absence of an agreement, express or implied, that Dr. Gerbode himself would perform it, or of evidence supporting the other theories of negligence raised by plaintiff. Beside Dr. Gerbode, four doctors testified that it was not customary for the attending physician to perform or to be present at the performance of an aortography, and that it is customary to have such a procedure performed by the hospital personnel who are accustomed to working together in the performance of this and other complicated diagnostic procedures and perform them regularly. There was no contradiction of this testimony. While Dr. Gerbode ordered the aortogram (and would be responsible for any negligence in prescribing such procedure) he cannot be held liable for the negligence of the team in the actual performance of it, as he neither participated in, nor had the right to direct it. When a patient is placed in a hospital his attending physician orders many procedures to be undertaken by the hospital staff or employees. Common examples are urinalysis, blood counts and X-rays. Suppose that in extracting blood for a count the hospital personnel negligently infected the patient. It could not be contended that the attending physician was liable for that negligence. The same is true here. The attending physician cannot be held liable for acts over which he had and could have no control.

This discussion is limited solely to the effect of custom, in the absence of an express or implied agreement that the attending physician will direct the procedure.

Plaintiff contends that because the majority of the aortographies performed in the bay area were performed in two hospitals, 89 at University of California Hospital, 168 at Franklin Hospital, 68 at all other hospitals (not including Fort Miley Hospital, the figures for which were not available), a total of 325, that it cannot be said there is a general custom but merely a custom of those two hospitals. This is a *non sequitur.* The record is not clear as to how many of this 325 were performed prior to plaintiff's operation. Conserva-

tively at least one-half were. ▮ Assuming only 162 as the proper figure, the performance of that many surgical procedures in a given area in a particular way should be sufficient to establish a custom or practice.

▮ Of course, the furnishing by the hospital of a surgical team would not relieve the attending surgeon of his obligation to determine the competency of such team. (One of plaintiff's contentions is that Dr. Gerbode failed in this duty.) But to hold that the attending surgeon who does not participate nor have the right to participate in the procedure is liable for the acts of a competent team supplied by the hospital would be against the best interests of patients generally. The patient by the use of such a team gets the benefit of medical people who have become experts in the particular procedure. That such is not the law is established by *Seneris* v. *Haas, supra,* 45 Cal.2d 811, 828-829, where the obstetrician who was engaged in the delivery of a baby was held not liable for the negligence of the accompanying anesthetist supplied by the hospital for negligence in giving the mother a spinal anesthetic. See also *Huber* v. *Protestant Deaconess Hospital Assn.,* (1956) —— Ind.App. —— [133 N.E.2d 864]; *Wiley* v. *Wharton,* (1941) 68 Ohio App. 345 [41 N.E.2d 255]. In *Sherman* v. *Hartman,* 137 Cal.App.2d 589 [290 P.2d 894], we held that the attending physician who left the patient in charge of a hospital nurse while a blood transfusion was still running was not liable for the nurse's negligence. See also *Hallinan* v. *Prindle,* 17 Cal.App.2d 656 [62 P.2d 1075] (hospital surgical nurse negligently placed formalin instead of novocaine on surgical tray and surgeon injected it in patient); *Hohenthal* v. *Smith,* 72 App.D.C. 343 [114 F.2d 494] (hospital intern negligent in administering a hypodermoclysis). Cases like *Ales* v. *Ryan,* 8 Cal.2d 82 [64 P.2d 409], *Key* v. *Caldwell,* 39 Cal.App.2d 698 [104 P.2d 87], *Armstrong* v. *Wallace,* 8 Cal.App.2d 429 [47 P.2d 740], and others cited by plaintiff are not in point. They all deal with hospital employees who were under the direct control and supervision of the surgeon performing the operation.

As the case will have to be tried again, we deem it unnecessary to discuss plaintiff's other claims of liability of defendant Gerbode such as his claim that Dr. Ellis was inexperienced, that Dr. Gerbode knew that fact and was therefore negligent in permitting him to perform the aortography, that defendant in view of plaintiff's condition was negligent in prescribing an aortography, and further that the evidence showed an ex-

press or implied agreement that defendant would perform it himself. The court's instructions on this subject left the determination of these matters to the jury depending upon its findings on the controverted facts.

3. *Instructions on Other Theories of Dr. Gerbode's Negligence.*

A number of instructions were given upon the question of liability of Dr. Gerbode for negligence of the surgical team (admittedly employees of defendant hospital). Reading them, it is difficult to tell whether some of them were not instructions that as a matter of law Dr. Gerbode was liable for their negligence, if any, or whether the jury were to determine the facts upon which such liability was based. The jury were not told clearly that in considering whether, in the absence of an express or implied understanding that he would participate in the procedure, the attending physician's liability for negligence of those participating in spite of a custom or practice to the contrary would depend upon whether the attending physician in view of that custom had any right to control the procedure. Two instructions, Number 25 on the "borrowed servant doctrine," and Number 26 which seems to assume that the team was assisting Dr. Gerbode and under his direction, leave it doubtful even when read with all the other instructions in the case, whether the jury would understand that the instructions only applied in the event the jury should find the facts upon which the rules of law there stated must be based. Plaintiff advanced several theories of Dr. Gerbode's liability. One was that as attending physician defendant Dr. Gerbode was liable for the acts of the team regardless of the general custom. Most of the other theories were based upon a conflict in the evidence, such as whether there was an express or implied contract that Dr. Gerbode would personally perform or direct the procedure, and whether Dr. Gerbode informed plaintiff of the type of procedure to be undertaken. Those were jury questions.

4. *Experimentation and the Manufacturer's Brochure.*

An instruction was given to the effect that if a surgeon seeks fields of experimentation in treating his patients he is accountable for any damages proximately caused by any unskillful treatment of the patient. A further instruction was given to the effect that if urokon was injected in greater amount than that recommended by the manufacturer's bro-

chure and if the jury found that such injection constituted experimentation, then all participating would be guilty of negligence unless the patient was first warned of the experimentation and consented to it. The first question to be considered hereunder is the admissibility of the brochure. It was published by the manufacturer of the sodium urokon. It stated that for translumbar aortography in an adult, "10 to 15 cc of 70% Urokon is adequate" and that aortography should not be repeated within 24 hours. The parties differ as to the meaning of the language. Plaintiff contends it negatives a second injection. Defendants contend it only negatives a second insertion of the needle, and that the second injection, the needle remaining in place after the first injection, in nowise contravenes the instruction. The uncontradicted evidence was that the second injection if deemed necessary is customary. In the "first run" in plaintiff's case, 30 c.c.'s, and in the "second run" 20 c.c.'s, a total of 50 c.c.'s, were injected. Dr. Wylie testified that it was customary to use 50 c.c.'s on the first run; Dr. Williams that the customary dosage was from 30 to 70 c.c.'s; Dr. Stone that 30 c.c.'s were the customary first run dosage; Dr. Abrams that 50 c.c.'s were the custom frequently followed by an additional 50 c.c.'s on the second run. There was no expert testimony that the amount used was improper. It is rather significant that the brochure recommends the use of 50 c.c.'s of urokon in another procedure involving injection of the contrast medium for visualization of the heart itself.

Defendants and amicus curiae urge that a manufacturer's brochure is not admissible in evidence and does not establish a standard of care. They contend drug manufacturers' recommendations are always conservative and are quickly outdated, that they expect and the custom is that after a material has been available for a period of time, physicians using it rely primarily on their own experience and the published literature of colleagues concerning its use in actual practice. They contend that the miraculous developments which have taken place in the effective use of antibiotics and other drugs might never have been accomplished if physicians were required to follow blindly the suggestions of the manufacturers who prepare but do not use them.

No objection was made to the introduction of the brochure at this trial, but the matter must be determined for the benefit of the court at a retrial. *Julien* v. *Barker*, (1954) 75 Idaho 413 [272 P.2d 718, 724], held admissible an instruc-

tion sheet issued by the manufacturer of and accompanying the anesthetic charged to have been negligently administered. The court stated (p. 724) : ". . . it is not conclusive evidence of standard or accepted practice in the use of the drug by physicians and surgeons, nor that a departure from such directions is negligent. But it is prima facie proof of a proper method of use, given by the maker, which must be presumed qualified to give directions for its use and warnings of any danger inherent therein. [Citations.]" Thus, while admissible, it cannot establish as a matter of law the standard of care required of a physician in the use of the drug. It may be considered by the jury along with the other evidence in the case to determine whether the particular physician met the standard of care required of him. The court's instruction on the subject should have been limited to this effect.

 The mere fact of a departure from the manufacturer's recommendation where such departure is customarily followed by physicians of standing in the locality does not make that departure an "experiment." There was in this case no evidence of experiment and the instructions concerning "experiment" should not have been given. Instructions without support in the evidence should not be given. (*Rodenberger* v. *Frederickson,* 111 Cal.App.2d 139, 142 [244 P.2d 107].)

5. *Instructions.*

(a) *Duty to Call a Specialist.*

It is difficult to understand the basis for these instructions. They informed the jury that it is the duty of a general practitioner to call in a specialist if the prudent practitioner would have done so. (These did not deal with the performance of the aortography by Dr. Ellis.) The evidence showed that Dr. Carson, plaintiff's physician, referred him to Dr. Gerbode because he was a specialist in the field of vascular surgery in which aortography is a diagnostic adjunct. It also showed that he is eminent in that field. He had had much experience with aortography before sodium urokon was used. His supposed ignorance is blamed upon his not knowing what was contained in the brochure, not being familiar with the Standard Nomenclature of Diseases and Operations published by the American Medical Association, and not knowing the effect of urokon injected elsewhere than in the aorta. The uncontradicted expert testimony was that the aortography was sound

medical practice under the circumstances. There was nothing in the evidence justifying the giving of these instructions.

### (b) *Duty to Disclose.*

Plaintiff, his wife and son testified that plaintiff was not informed that anything in the nature of an aortography was to be performed. Dr. Gerbode and Dr. Ellis contradicted this, although admitting that the details of the procedure and the possible dangers therefrom were not explained. The court gave a rather broad instruction upon the duty of a physician to disclose to the patient "all the facts which mutually affect his rights and interests and of the surgical risk, hazard and danger, if any. . . ." ▆▆▆ A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment. ▆▆▆ Likewise the physician may not minimize the known dangers of a procedure or operation in order to induce his patient's consent. ▆▆▆ At the same time, the physician must place the welfare of his patient above all else and this very fact places him in a position in which he sometimes must choose between two alternative courses of action. ▆▆▆ One is to explain to the patient every risk attendant upon any surgical procedure or operation, no matter how remote; this may well result in alarming a patient who is already unduly apprehensive and who may as a result refuse to undertake surgery in which there is in fact minimal risk; it may also result in actually increasing the risks by reason of the physiological results of the apprehension itself. The other is to recognize that each patient presents a separate problem, that the patient's mental and emotional condition is important and in certain cases may be crucial, and that in discussing the element of risk a certain amount of discretion must be employed consistent with the full disclosure of facts necessary to an informed consent. (*Hunt* v. *Bradshaw* (1955), 242 N.C. 517 [88 S.E.2d 762]; *cf. Simone* v. *Sabo* (1951), 37 Cal.2d 253 [231 P.2d 19]; *Schloendorff* v. *Society of New York Hospital* (1914), 211 N.Y. 125 [105 N.E. 92, 52 L.R.A.N.S. 505].)

The instruction given should be modified to inform the jury that the physician has such discretion consistent, of course, with the full disclosure of facts necessary to an informed consent.

(c) *Failure to Produce Evidence.*

 Three instructions were given on this subject, one general and two applying only to the defendants. They should not have been given. There was no evidence in the case to justify the instructions. Defendants produced the witnesses engaged in the procedure and endeavored to explain the cause of the injury. Whether they successfully explained it or negatived the facts upon which the charge of negligence was based was a matter for the jury, and the jury were so told. (There were many instructions on the duty and liability of defendants, unnecessarily repetitive.) There was nothing in the case to show, whether res ipsa loquitur applied or did not, that there was any suppression of evidence or failure to produce any evidence by defendants.

6. *Medical Texts As Evidence.*

One of the questions which will undoubtedly be raised at a retrial is the admissibility of medical text books, pamphlets and periodicals. In *Gluckstein* v. *Lipsett,* 93 Cal.App. 2d 391 [209 P.2d 98][9], we reviewed the cases in California dealing with the subject and held that on direct examination medical text books were not admissible. On cross-examination they were admissible *only* if the expert witness "has based his opinion either generally or specifically on a medical work or medical works. . . ." (P. 403.) This rule has been in nowise changed. This rule does not permit reading to a witness who has not based his opinion on a medical work, text or brochure, extracts therefrom as a part of a question.

7. *Reference to Malpractice Judgments.*

 It is improper in argument to refer to judgments given in malpractice actions whether brought against doctors or lawyers or to refer to any protection either has against such actions.

The judgment is reversed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied November 21, 1957, and respondent's petition for a hearing by the Supreme Court was denied December 18, 1957. Kaufman, J. pro tem.,* participated therein in place of Spence, J. Gibson, C. J., and Carter, J., were of the opinion that the petition should be granted.

___

[9]See article on California Malpractice, vol. 9, Stan.L.Rev., p. 731, at pp. 742-743, *supra.*

*Assigned by Chairman of Judicial Council.