Filed 12/12/14  Miller v. Verizon Wireless CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JERRY P. MILLER, | D063970 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2010-00092363-CU-BC-CTL) |
| VERIZON WIRELESS, | |
| Defendant and Respondent. | |


APPEAL from a judgment and postjudgment orders of the Superior Court of San Diego County,  John S. Meyer, Judge.  Affirmed.

Franklin & Franklin and J. David Franklin; Law Offices of Anthony A. Ferrigno and Anthony A. Ferrigno for Plaintiff and Appellant.

Katten Muchin Rosenman, Ryan J. Larson, Jarin R. Jackson and Alan D. Croll for Defendants and Respondents.

Plaintiff and appellant Jerry P. Miller doing business as Imagineering Cellular and Imagineering Wireless (Miller, or at times, Imagineering) appeals from a judgment in favor of defendants and respondents Cellco Partnership, dba Verizon Wireless, Los

Angeles SMSA Limited Partnership dba Verizon Wireless, Oxnard/Ventura/Simi Limited Partnership dba Verizon Wireless, and Verizon Wireless (VAW) LLC dba Verizon Wireless (collectively Verizon). Miller sued Verizon for breach of an agency agreement, alleging in part that Verizon breached the agreement by terminating his agency without providing a required "cure" period, and waived its right to enforce certain provisions of the agreement that Verizon claimed justified Miller's termination. By special verdict, the jury found in Verizon's favor. The trial court denied Miller's postjudgment motions, including his motion for judgment notwithstanding the verdict (JNOV).

Miller contends the court erred by presenting the jury with a legally erroneous special verdict form that assertedly prevented the jury from reaching a verdict on Miller's cure-period theory of breach. He contends the invited error doctrine did not preclude him from objecting to the verdict form, nor does the doctrine apply because he brought the verdict form's defects to the court's attention before the jury rendered its verdict. Finally, Miller argues the trial court should have granted JNOV because the evidence was not conflicting as to Verizon's breach. We affirm the judgment and postjudgment orders.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2003, Miller, who had been a long time agent for various predecessor wireless telephone service providers, signed a four-year exclusive agency agreement with Verizon. The April 2003 agency agreement precluded Miller from using unauthorized subagents or obtaining customers via the Internet without Verizon's express written consent. At some point during 2004, Miller began relying on Franco Caffagni to run his business, Imagineering.

2

In 2005, 2006 and 2007, Verizon representatives learned Miller was selling Verizon service over the Internet, and informed him and/or Caffagni in telephone calls, in-person meetings, e-mails and letters that such sales by Miller or his subagents were not allowed. Despite these violations, Miller and Verizon entered into a new four-year exclusive agency agreement, the Verizon Wireless Agent Agreement (the April 2007 agreement or simply, the agreement) that became effective in April 2007. That agreement also precluded Miller from using unauthorized subagents or obtaining customers via the Internet without Verizon's express written consent.

By April 2009, Verizon had discovered that Miller was working with MDG Computer Services (MDG), to which Miller paid commissions for online orders from customers, including customers outside Miller's designated sales area. On May 15, 2009, Verizon sent a cease and desist letter to Miller demanding his compliance with the agreement. Miller sought Verizon's approval for online transactions but was unsuccessful, and in June 2009, Caffagni notified Verizon that Miller had "severed all ties" with MDG. According to Caffagni, as of this time, Miller had ceased activations with MDG. However, Miller thereafter continued to take online activations from customers referred from MDG and paid MDG compensation. In late 2008 or early 2009 Miller began working with another unauthorized subagent, More Mobile Internet, but did not tell Verizon about that company.

In December 2009, Verizon conducted an investigation and learned that Miller was still obtaining online activations, and that at least one customer had signed up for Verizon service through More Mobile Internet. On December 29, 2009, Verizon

3

representatives met with Miller and Caffagni, and advised them it had learned of Imagineering's continued Internet activations, and that Verizon was terminating the April 2007 agreement in part because of a lack of integrity and trust. That day, Verizon mailed a letter terminating Miller's agency. In part, the letter states: "It has come to our attention that you and Imagineering Cellular is [*sic*] again using a third party to offer, sell and market Verizon Wireless Services in a manner that violates multiple provisions of your Agreement with Verizon Wireless. Specifically, you are working with the operator of a website—www.moremobileinterent.com—to solicit sales from customers around the country for which you then activate using the Verizon Wireless provided tool and the outlet ID assigned to you for your San Diego, California location. [¶] You have been warned several times over the past few years about this type of improper solicitation of Verizon Wireless customers and use of a third party who is not authorized to sell Verizon Wireless services. The last warning occurred in May 2009 and resulted in our May 15, 2009 breach notification letter. It has become abundantly clear to us that you have no intent on heeding our warning and adhering to the Agreement and we are forced by your actions to terminate, effective immediately, your Agreement with Verizon Wireless as of December 29, 2009.

*Miller's Complaint*

In May 2010, Miller sued Verizon for breach of contract (first and second causes of action), unfair and unlawful business practices (third and fourth causes of action), and declaratory relief (fifth cause of action). Miller alleged that for 24 years he had been a wireless agent for one or more of the defendants, and had entered into the April 2007

4

agreement, a form drafted by Verizon, without negotiation.  In his first breach of contract cause of action, Miller alleged he was wrongfully terminated due to Verizon's breach of the agreement specifying applicable "cure" periods for various breaches, and suffered damage as a result.  He alleged in his second breach of contract cause of action that Verizon was estopped from terminating his agency under the agreement as it had waived paragraph 3.6[1] under which it purported to terminate him.

Verizon successfully demurred to the complaint.  Miller, who had opposed the demurrer only as to the first breach of contract cause of action, appealed the judgment, and this court in an unpublished opinion reversed the trial court's order sustaining the demurrer to the first cause of action, leaving that cause of action to proceed.  (*Miller v. Cellco Partnership* (Oct. 27, 2011, D058651) [nonpub. opn.].)  The matter proceeded to a jury trial following Verizon's unsuccessful motion for summary judgment.

*Trial Evidence*

The April 2007 agreement was introduced into evidence at trial.  Section 3, entitled "Duties and Responsibilities of Agent," provides in part that the "Agent shall

---

[1]    Paragraph 3.6 of the agreement states in part:  "Agent's authority to sell and activate [Verizon] service is limited to the locations and approved subagent locations. Without limiting the generality of the foregoing, agent shall not, without prior written consent of [Verizon], which can be modified or rescinded at any time, advertise, solicit or consummate any sale or activation of [Verizon] service through (a) any e-commerce functionality, including, but not limited to, a website operated directly or indirectly by agent, or (b) telemarketing."  (Some capitalization omitted.)  In his complaint, Miller alleged that despite this provision, he had been making Internet website sales on Verizon's behalf for a number of years and was asked to cease in 2005, which he did for a short time but resumed that same year until Verizon terminated him in December 2009.

conduct itself with the highest standards of honesty, integrity and fair dealing . . . ." Paragraph 8 of the agreement, entitled "Breach, Termination," provides: "This Agreement may be terminated immediately upon written notice to the breaching party if the breach is not cured within the applicable cure period provided, however, that such termination notice may not be sent until after the applicable cure period has expired." Paragraph 8.7 of the agreement states: "For any breach of this Agreement for which a particular cure period is not specified, the breaching party shall have a thirty (30) day cure period."

Section 8.3 of the agreement provides: "8.3 With respect to the following breaches there shall be no cure period and [Verizon] has the right to terminate this Agreement immediately upon written notice to Agent if: [¶] 8.3.1 Agent engages in conduct that, in [Verizon's] reasonable discretion, constitutes unethical, misleading, or unfair business practices; [¶] 8.3.2 [Verizon] determines, in its reasonable discretion, that any representation or warranty made by Agent in connection with this Agreement or its application to act as a [Verizon] Agent is untrue . . . ."

Also admitted into evidence were Miller's discovery admissions that Verizon never gave him prior written consent to sell Verizon service over the Internet; he never signed a written agreement with Verizon (a) allowing him to sell Verizon service over the Internet, (b) amending or modifying the April 2007 agreement or (c) permitting him to sell service outside the area designated in his April 2007 agreement; and no one from Verizon told Miller after May 15, 2009 that he was permitted to conduct Internet sales.

6

At trial, Miller sought to present evidence that Verizon was aware of his Internet sales and benefitted from them, but then terminated his agency on the sole ground of those improper sales, thus breaching the agreement by failing to provide the 30-day cure period required under section 8.7. Miller testified that on December 28, 2009, Verizon's director of indirect sales Michael Coil called him and advised him Verizon was terminating his contract due to his Internet selling. According to both Miller and Caffagni, at the December 29, 2009 in-person meeting, Coil's only stated reason for his termination was Miller's sales with More Mobile Internet. Thus, Miller sought to prove that Verizon's breach was the fact that the December 29, 2009 termination was effective immediately.

Among other witnesses, Miller called Verizon employees Kathy Zombolas, Ryan Hooper and Coil, who met with Miller and Caffagni on December 29, 2009. Coil acknowledged the December 29, 2009 termination letter did not include the words "trust" and "integrity," but he testified that at the in-person meeting "we continually talked about I had a lack of trust and there was a lack of integrity with Imagineering. It was said on repetitive, numerous times to Mr. Miller." Miller's counsel presented Coil with deposition testimony in which Coil was asked for "any and all" reasons for Miller's termination and specified Miller's Internet sales, use of an unapproved third party, and activating customers outside of his approved selling area. At trial, Coil responded to his deposition testimony as follows: "I think I was asked the question and I gave the three reasons contractually that were part of that that came to mind. And I think that if you look at the way the letter was written, there's definitely a question of integrity and trust

7

that was written in there about repeated violations of the contract . . . ."  Coil testified, "I wouldn't be terminating somebody if I had trust, confidence and they were within their contractual obligations, they would still be here."

Zombolas testified that at the December 29, 2009 meeting, Coil told Miller and Caffagni that the agreement was being terminated due to Internet sales, as well as "a couple of other items."  According to Zombolas, Miller and Caffagni did not dispute their unauthorized sales, but asked for another chance.  Zombolas testified about how Coil evaluated Imagineering's conduct, stating, "[I]t was integrity issues, not trusting the agent and that they had been warned."  Hooper testified that Coil told Miller that one of the reasons he was being terminated was a lack of integrity and trust on Miller's part.  According to Hooper, Coil specifically said those words at that meeting.

*The Special Verdict Form*

After the trial court heard the parties' pretrial evidentiary motions, it asked whether counsel had met and conferred regarding the special verdict form.  Plaintiffs' counsel, David Franklin, advised the court they had not, and the following colloquy ensued:

"The Court:  Okay, I really want—I'm insisting that that be done.

"Mr. Franklin:  Okay.

"The Court:  I want it Wednesday morning.  I want—I want a set of instructions and a verdict form that's going to be right out of CACI, breach of contract and so—

"[Verizon's counsel]:  Yes, your Honor, I understand.  I had done my own special verdict form.  Your Honor [on] Friday said no, I want CACI, and I said okay.

8

"The Court:  Okay."  Attorney Franklin went on to discuss the special jury instructions, and there was no further discussion of the special verdict form that day.

The next day, the verdict form came up again after the jury adjourned.  Verizon's counsel stated he had a verdict form, Judicial Council form VF300, which was acceptable to Verizon.  Attorney Franklin advised the court the form was not acceptable, stating: "[T]here are alternative provisions.  You select one, you can't have the other one.  That's my problem with it.  They're bracketed information all throughout that jury instruction [*sic*], and it needs to have a referee, if you will, to determine what should go in—of the bracketed information, what should go in and what should stay out."  Because the verdict form was not in the proper format, the court instructed defense counsel to submit a proper form and defense counsel agreed, after which attorney Franklin offered to present plaintiff's own proposed verdict form the following week.

After the jury adjourned the following day, Verizon's counsel submitted a special verdict form.  Attorney Franklin did not have plaintiffs' version, and he reminded the court he had been given until the following week to submit it.  The court instructed him to submit it the next day.  The court told attorney Franklin to submit an informal form that could be handwritten, and he agreed to provide it the next day before the close of business.

The court and parties discussed the special verdict form again on February 19, 2013,[2] and February 25, 2013, when Verizon's counsel assured the court he and attorney Franklin would discuss the matter that evening. The next day, after further discussion about the wording of the verdict form concerning plaintiffs' claim that Verizon had waived its right to enforce certain portions of the agreement, the court ordered the parties to deliver the completed verdict form "first thing tomorrow morning." That evening, Verizon's counsel e-mailed attorney Franklin the special verdict form. Franklin replied, "I will sign off on the Special Verdict Form."

The next morning, counsel for Miller and Verizon announced they had agreed on a special verdict form. After the close of evidence, counsel discussed the signature page of the form, at which time attorney Franklin said: "I think the way to handle [the verdict form], your honor, we can both stipulate that we both signed and concurred on the verdict form on the record, and I don't think the court—[¶] The Court: All right, I agree." Verizon's counsel referred to the special verdict form in closing argument, explaining to the jury the questions it was required to answer. The court then instructed the jury, after which a sidebar conference was held where counsel discussed whether each juror would receive a verdict form and whether there would be a "master" form. Before the jurors

---

2    Attorney Franklin advised the court that his problem was with question No. 3 on the special verdict form, which reads: "Did all the conditions that were required for [*name of defendant*]'s performance occur or were they excused?" Franklin said, "[A]ll I'm saying is that item No. 3 there is optional, according to the direction for use. . . . They've never been able to identify to me what condition it is that Verizon was supposed to have fulfilled before, you know, as far as I know, there are no conditions precedent as relates to Verizon in this case." Franklin offered to submit briefing on the issue. The parties do not refer to or relate the substance of that briefing.

10

adjourned, the court instructed them how to handle the original verdict form and copies. The jury then adjourned to deliberate.

On March 4, 2013, the court announced that the jury had reached a verdict. Attorney Franklin's co-counsel, Anthony Ferrigno, responded by taking issue with the verdict form, over Verizon's counsel's objection:

Mr. Ferrigno: ". . . [T]here's an issue on the special verdict form I need to raise before [the verdict is] announced on the record. [¶] . . . [¶] [Verizon's counsel objects] [¶] . . . Mr. Franklin and defense counsel entered into this special verdict form and, you know, I hadn't seen it. So he was handling that. [¶] . . . [¶] . . . You kept pushing the parties to get the special verdict form done. I was not handling that. But I have seen something in this that I need to call to the Court's attention because it's wrong." After counsel's explanation, the court responded: "Let me back up for a minute. This is a breach of contract. And as I indicated, the breach-of-contract verdict form is in CACI. It's right there. And it—and it's straightforward. And I wanted to give it. And the parties went round and round, and Mr. Franklin objected and I was inclined to agree with him after a lot of argument. [¶] And then the parties met and conferred and represented to the Court on six or seven occasions, 'We've agreed on a verdict form we're both happy with. Here it is.' [¶] . . . [¶] And I had some questions about it. But I said if it's good for you, it's good for me. And it was good for them. And I just said it is what it is and it seems okay."

Eventually, the court asked how attorney Ferrigno proposed the verdict form be corrected. When it was unable to get an answer, the court told counsel it would consider

11

having the jury answer question No. 3, declining counsel's request for 15 minutes to correct the form and insert a new question. Attorney Ferrigno took exception. The court finally ruled it would take the jury's verdict: "If it's error, it's invited error. If it's error, it's waived. It's done."

*Miller's Motion for JNOV*

Miller moved for JNOV and a new trial, and also sought to set aside and vacate the judgment. In his motion for JNOV, he argued he was entitled to such relief under cases such as *Mikialian v. City of Los Angeles* (1978) 79 Cal.App.3d 150 (*Mikialian*) and *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634 (*Roddenberry*), under which the trial court was required to reject Verizon witnesses' trial testimony that contradicted admissions made in their depositions. According to Miller, this left the court with evidence that the sole reason Coil terminated Miller's agency agreement was for unauthorized Internet sales, requiring a 30-day cure period. The trial court denied the motion, ruling Miller had not shown the trial evidence was insufficient as a matter of law to support the jury's verdict.

Miller filed the present appeal.

DISCUSSION

I. *Claims Relating to the Special Verdict Form*

The special verdict form submitted to the jury, entitled Joint Proposed Special Verdict Form; VF-300, reads as follows:

"Please answer the following questions as your verdict in this matter, according to the instructions given to you by the Court and the instructions contained in this form.

12

BREACH OF CONTRACT

We answer the questions submitted to us as follows:

1. Did Jerry P. Miller d/b/a Imagineering Cellular and Imagineering Wireless and Verizon Wireless enter into a contract?

_____ Yes          _____ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Jerry P. Miller d/b/a Imagineering Cellular and Imagineering Wireless do all, or substantially all, of the significant things that the contract required it to do?

_____ Yes          _____ No

or

Has Jerry P. Miller d/b/a Imagineering Cellular and Imagineering Wireless proved by clear and convincing evidence that Verizon Wireless waived the right to enforce the following terms of the contract: the prohibition against obtaining activations using the Internet; the prohibition against obtaining activations using an unauthorized sub-agent; and the prohibition against obtaining activations outside of its designated territory?

_____ Yes          _____ No

If your answer to either option for question 2 is yes, then answer question 3. If you answered no to both options, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did Verizon Wireless do something that the contract prohibited it from doing?

_____ Yes          _____ No

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Jerry Miller d/b/a Imagineering Cellular and Imagineering Wireless harmed by that failure?

13

_____ Yes        _____ No

> If your answer to questions [*sic*] 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

> 5. What are Jerry Miller d/b/a Imagineering Cellular and Imagineering Wireless's damages?

> $_____

Signed:_____
          Presiding Juror

Dated:_____

After this verdict form has been signed, notify the bailiff that you are ready to present your verdict in the courtroom."

The jury answered "yes" to question No. 1, and "no" to both parts of question No. 2. It signed and returned the form.

Miller contends the trial court reversibly erred in presenting the special verdict form to the jury because it contained questions dealing only with his waiver claim, and not his claim that Verizon breached the agency agreement by failing to provide a cure period before terminating the agreement. Asserting his breach of contract claims were separate causes of action, Miller suggests the court's entry of judgment on that verdict form was premature and violated the one final judgment rule because it did not resolve all of his causes of action. Miller finally argues the invited error doctrine does not preclude him from objecting to the form, nor does it apply where his counsel brought the errors to the court's attention before the jury issued its verdict.

14

A. *Miller Proceeded to Trial on A Single Breach of Contract Cause of Action*

Miller's argument concerning the final judgment rule fails on its premise. That is, as Verizon points out, Miller's argument is grounded on the notion that he asserted two separate causes of action for breach of contract, when in fact following Verizon's demurrer and Miller's failure to oppose it as to all but the first cause of action, Miller was left with a single cause of action for breach of contract. Thus, while Miller may have originally filed a complaint containing two breach of contract causes of action, in the end he was left with, and pursued to trial, only one. As a result, the cases on which Miller relies for general principles relating to the one final judgment rule (e.g., *Cobb v. University of So. California* (1996) 45 Cal.App.4th 1140, 1145; *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 741), and the proposition that the trial court must provide proper jury instructions (e.g., *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548),[3] are inapposite.

Miller's reliance upon our prior opinion addressing Verizon's demurrer to support his dual cause of action theory is wholly without merit. Indeed, we acknowledged there that Miller's concession "admitted that his breach of contract claim based upon waiver was not valid" and that Miller "agreed he was not entitled to damages based upon this theory of breach of contract." (*Miller v. Cellco Partnership*, *supra*, D058651.) This

_____

[3] We are perplexed by Miller's reliance on instructional error cases for the proposition that parties are entitled to have the jury instructed on all theories of the case that are supported by the pleadings and evidence. Miller does not challenge the jury instructions given by the trial court, and even if he did, the record does not contain the instructions provided to the jury, which went unreported. Nor does Miller attempt to draw an analogy to these cases in any way. We see none.

15

portion of our opinion, to the extent it is relevant at all, stands for precisely the opposite of what Miller claims.

B. *Waiver*

Verizon argues that Miller waived any right to object to the verdict form by first agreeing to the special verdict form, and then failing to object until days after it had been submitted to the clerk, after closing arguments in which Verizon's counsel specifically referred to the form's question, after the form had been given to the jury, and after the jury had announced it had reached its verdict. It relies on the basic principle that a party loses the right to appeal an issue by failing to take proper steps to avoid or correct the error. In part, it cites *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, *Hercules Powder Co. v. Automatic Sprinkler Corp. of America* (1957) 151 Cal.App.2d 387, and *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949.

We conclude that under these specific circumstances, the doctrine of waiver applies. Generally, " 'an appellant may waive his right to attack error by expressly or impliedly agreeing at trial to the ruling or procedure objected to on appeal.' " (*Mesecher v. County of San Diego*, *supra*, 9 Cal.App.4th at p. 1685.) More specifically, "[i]t is incumbent upon counsel to propose a special verdict that does not mislead a jury into bringing an improper special verdict." (*Myers Building Indus., Ltd. v. Interface Technology, Inc.*, *supra*, 13 Cal.App.4th at p. 960, fn. 8.) In the absence of a timely objection raised before a special verdict form is submitted to the jury, the party will waive defects in the form of the verdict. (*Hercules Powder Co. v. Automatic Sprinkler*

16

*Corp. of America*, *supra*, 151 Cal.App.2d at p. 401 [defect in form of verdict omitting a defendant waived by failure to object at the time the forms were submitted to the jury, nor when the verdict was rendered]; *Joerger v. Pacific Gas & Electric Co.* (1929) 207 Cal. 8, 21 [defendants prevented from raising issue as to verdict form; "When the form of verdict was considered by the court in the presence of counsel for all parties, some question arose with reference to it, but it was finally agreed that the one adopted by the court should be given to the jury. Had defendants desired a different form, they should have asked for it"]; see, e.g., *Cembrook v. Sterling Drug Inc.* (1964) 231 Cal.App.2d 52, 62-63 ["The applicable rule is that in the absence of an objection to the form of the request for special findings of fact at the time of submission of the questions to the jury, it will be presumed that there was an assent to the questions as presented and the complaining party cannot raise the issue for the first time on appeal."].)

Here, attorney Franklin's objections to the form before its submission to the jury did not raise any issue with Verizon's obligations relating to the 30-day cure period, and ultimately he agreed to the form of the verdict, permitting it to be submitted to the jury and argued by Verizon's counsel. Even when Miller's co-counsel belatedly objected to the verdict form at the time the court announced the jury had reached a verdict, he took exception to the court's offer to correct the matter by having the jury answer question No. 3 on the form: "Did Verizon Wireless do something that the contract prohibited it from doing?" This question would have encompassed Miller's claim, which was argued vigorously by counsel during closing arguments, that Verizon breached the agreement by failing to give Miller a 30-day period to cure his breaches. And after the jury rendered its

17

verdict, Miller did not again challenge the verdict before the jurors were discharged. Under all of these circumstances, we cannot say Miller preserved any claim of defect in the form of the special verdict.

C. *The Verdict Form was Not Ambiguous*

Irrespective of Miller's waiver, we conclude the verdict form is not ambiguous. "[A] special verdict is that by which the jury finds the facts only, leaving the judgment to the Court. The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law." (Code Civ. Proc., § 624.)

" 'Unlike a general verdict (which merely *implies* findings on all issues in favor of the plaintiff or defendant), a special verdict presents to the jury each ultimate fact in the case. The jury must resolve all of the ultimate facts presented to it in the special verdict, so that "nothing shall remain to the court but to draw from them conclusions of law." [Citation.] [¶] The requirement that the jury must resolve every controverted issue is one of the recognized pitfalls of special verdicts. "The possibility of a defective or incomplete special verdict, or possibly no verdict at all, is much greater than with a general verdict that is tested by special findings . . . ." ' " (*Myers Building Industries, Ltd. v. Interface Technology, Inc.*, *supra*, 13 Cal.App.4th at pp. 959-960.)

"A special verdict is 'fatally defective' if it does not allow the jury to resolve every controverted issue." (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325 (*Saxena* ).) "If a fact necessary to support a cause of action is not included in such a special verdict,

judgment on that cause of action cannot stand." (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 531.) We analyze the correctness of the special verdict as a matter of law. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678; *Saxena*, at p. 325.) If it is not "hopelessly ambiguous," we may interpret it from its language considered in connection with the pleadings, evidence and instructions. (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092.) If a special verdict is "hopelessly ambiguous," failure to seek clarification from the jury does not create a forfeiture, and the proper remedy is ordinarily a retrial on the issues underlying the defective verdict. (*Ibid.*)

Here, question No. 2 on the special verdict form asked the jury to decide whether Miller's conduct complied, or substantially complied, with the agreement. The jury answered "no" to the question. We look to the evidence, including the agreement, which required Miller to conduct himself with honesty, integrity and fair dealing, in interpreting that question and the verdict as a whole. Doing so, the question and verdict as a whole is reasonably interpreted to resolve Miller's controverted cure-period theory of breach: whether Miller conducted his business without honesty and integrity, entitling Verizon to terminate his agreement without a cure period. Thus, there is no indication the special verdict form deprived Miller of the right to have the jury resolve this issue, and given the record as a whole, we are satisfied the jury understood the form required it to resolve Miller's claim that Verizon breached the agreement in this particular manner. As written, there is no ambiguity or defect in the special verdict form.

19

D. *Harmless Error*

Additionally, we conclude that any error in the verdict form is harmless in view of the evidence in this case. (See *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1244 [rejecting any contention that a defective special verdict form is reversible per se or structural error].) The California Constitution provides: "No judgment shall be set aside . . . as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) "Code of Civil Procedure section 475[ ] is even broader [than its constitutional counterpart], and, in pertinent part, provides: 'The court must, in every stage of the action, disregard any error or defect in the . . . proceedings which, in the opinion of said court, does not affect the substantial rights of the parties.' Mr. Witkin has interpreted these rules as requiring affirmance of a judgment, even in the face of substantial error, if the judgment is 'clearly right.' " (*Taylor*, at p. 1245, citing 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 442, pp. 495-497.)

Here, as in *Taylor*, the use of the verdict form "did not deprive [Miller] of the right to a jury trial or a fundamentally fair hearing. [Miller] had a lengthy jury trial before a fair and unbiased trial judge and jury [who] . . . did what they were expected to do. [The jury] conscientiously considered the case in accordance with the facts and the law." (*Taylor v. Nabors Drilling USA, LP*, *supra*, 222 Cal.App.4th at p. 1245.) Also, like *Taylor*, we conclude the judgment is " 'clearly right.' " (*Id.* at p. 1246.) The evidence is undisputed that Miller repeatedly violated his agency agreements by selling Verizon

20

service via the Internet.  The evidence also compels the conclusions that (1) Miller continued to violate his agreement by selling online after assuring Verizon he would cease that conduct; (2) Verizon employees, Coil in particular, concluded Miller lacked integrity and Coil had lost trust in Miller; and (3) Coil informed Miller at the time of Miller's termination that Coil lost trust and confidence in Miller and that Miller lacked integrity.  As we explain below in connection with Miller's JNOV arguments, the evidence is sufficient to support the conclusion that Miller's conduct gave Verizon the right to terminate him without notice or a cure period because Verizon was entitled to conclude he had conducted himself in an unethical and misleading manner, and because he had made untrue representations to Verizon relating to his agreement.  Thus, we have no "legitimate doubt" concerning prejudice (*Taylor*, at p. 1246), and conclude it is not reasonably probable that Miller would prevail at a new trial on the question of his right to a 30-day cure period, even assuming that question should have been submitted for the jury's consideration.

II.  *Denial of Plaintiff's Motion for JNOV*

A.  *Legal Principles and Standard of Review*

" 'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.  [Citation.]  [¶]  . . .  As in the trial court, the standard of review [on appeal] is whether any substantial evidence— contradicted or uncontradicted—supports the jury's conclusion.' "  (*Cabral v. Ralphs*

21

*Grocery Co.* (2011) 51 Cal.4th 764, 770, quoting *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)

When an appellant claims a factual finding is not supported by substantial evidence, our power " '*begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support' " the finding. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) We presume the record contains evidence sufficient to support the judgment and it is the appellant's burden to demonstrate otherwise. (*Ibid.*) We do not reweigh evidence or assess the credibility of witnesses. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.) Evidence is substantial if it is of "ponderable legal significance . . . reasonable, credible and of solid value." (*Roddenberry*, *supra*, 44 Cal.App.4th at p. 651.)

B.  *Analysis*

Miller contends the trial court erred in denying his motion for JNOV. Focusing on Coil, and claiming Coil is the "only witness who really counts" on the issue, he argues there is no substantial evidence contradicting Coil's reasons for terminating Miller's agreement, all of which required Verizon to provide a 30-day cure period. Miller asserts he could not exercise his right under the agreement to a cure period unless Verizon gave him notice of what breach was the basis for his termination and he characterizes the evidence as "uncontroverted" that "Coil, the person who made the decision to terminate [him], did not include a violation of [paragraphs] 8.3.1 or 8.3.2 as a reason for termination of [his] agency agreement." According to Miller, any trial testimony by Coil and others that Coil had lost trust and confidence in Miller was impeached by deposition

22

testimony in which the witnesses explained the reasons for Miller's termination without using the words "integrity" or "trust." In short, Miller's position is that Coil's trial testimony about his reasons for Miller's termination for reasons of trust and integrity cannot constitute substantial evidence in support of the jury's verdict.[4]

In making his arguments, Miller quotes from this court's October 2011 decision addressing the sufficiency of Miller's pleading challenged by Verizon's demurrer, and also from the trial court's order denying Verizon's motion for summary judgment. Miller also points out that witnesses such as Zombolas did not present any evidence in support of Verizon's summary judgment motion. Miller, however, does not explain why our prior decision and the trial court's summary judgment ruling are pertinent to the question at hand, which as we have explained is whether the *trial evidence* is sufficient to support the jury's findings and verdict. Nothing from these prior rulings assists that determination.

Miller also repeats the same arguments made in his JNOV motion and his reliance on *Mikialian*, *supra*, 79 Cal.App.3d 150 and *Roddenberry*, *supra*, 44 Cal.App.4th 634. The argument is premised on Miller's assertion that the deposition testimony of Coil, Hooper and Zombolas directly contradicted their trial testimony. But we reject this premise, as well as Miller's characterization of these witnesses' prior testimony as fatally

---

[4] In his reply brief, Miller further contends that he was entitled to JNOV because the jury made no findings as to his 30-day cure period claim, and thus whether the evidence supported Verizon's right to terminate under sections 8.3.1 or 8.3.2 of the agreement is "irrelevant." Miller did not advance this particular theory in challenging denial of JNOV in his opening brief. But even if we were to consider the new theory, Miller provides no legal authority for his propositions, and we have already rejected his claim that the verdict form was ambiguous on that issue.

23

inconsistent. For example, Hooper testified at his deposition that during the December 29, 2009 meeting, Miller's Internet sales "was *one of the discussions* that was brought up of the violations of the contract" and there were "multiple discussions of violations of contract between Internet sales to having subagents not selling—what's the word I'm looking for? Exclusivity . . . ." (Emphasis added.) Hooper stated, "And the online selling was a violation of the contract as well." This testimony simply does not contradict Hooper's trial testimony that Coil told Miller he was terminating the contract for a lack of integrity and trust. In her deposition, Zombolas was asked, "And [Coil] specifically told Mr. Miller and/or Mr. Caffagni that Imagineering would be terminated because they were selling over the Internet?" She responded, "Yes." Nothing in that testimony contradicts her trial testimony that Coil *also* told them they were being terminated for other reasons.

Finally, Coil's deposition and trial testimony is significantly different than the trial testimony deemed insufficient in *Mikialian*. In *Mikialian*, the Court of Appeal reviewed a judgment of nonsuit in a case involving a plaintiff truck driver injured in a hit and run accident. At trial, the plaintiff sought to establish liability on the defendant city by testifying a police officer had directed him to park his truck in the spot where he was struck. (*Mikialian*, *supra*, 79 Cal.App.3d at p. 154.) This testimony, however, contradicted the plaintiff's prior deposition testimony in which he denied anyone directed him to pull his truck to the location. (*Id*. at p. 155.) At trial, the plaintiff did not attempt to correct his deposition testimony, nor did he explain his answers were a product of misunderstanding, confusion or mistake. (*Id*. at pp. 155, 160.)

24

The Court of Appeal concluded the plaintiff's trial testimony that the officers had directed him where to park did not constitute substantial evidence creating an issue of fact on the question of the city's liability. (*Mikialian*, 79 Cal.App.3d at pp. 158, 160.) Its reasoning turned on the principle, expressed in *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, that party admissions made in discovery carry a presumption of trustworthiness and should receive deference over and above other types of evidence, such as counteraffidavits submitted in opposition to summary judgment. (*Mikialian*, at pp. 160-161.)[5] The Court of Appeal emphasized that the plaintiff's testimony on that point was the "keystone" of his claim against the city, and it explained that if the plaintiff had explained his former testimony at trial, it "would have created a fact issue." (*Id.* at p. 159, 160.) Characterizing the plaintiff's deposition testimony as an unequivocal and "clear admission[] of fact" (*id.* at pp. 158, 160), the court in part stated, " '[I]f a party testifies deliberately to a concrete fact, not as a matter of opinion, estimate, appearance,

_____

5       In part, the *Mikialian* court reasoned:  " 'The reasons for this attitude toward the legitimate products of discovery are clear.  As the law recognizes in other contexts [citations] admissions against interest have a very high credibility value.  This is especially true when, as in this case, the admission is obtained not in the normal course of human activities and affairs but in the context of an established pretrial procedure whose purpose is to elicit facts.  Accordingly, when such an admission becomes relevant to the determination . . . of whether or not there exist triable issues of *fact* (as opposed to legal issues) between the parties, it is entitled to and should receive a kind of deference not normally accorded evidentiary allegations in affidavits.  [Citations.]'  The rule stated in *D'Amico*[*v. Board of Medical Examiners*, *supra*, 11 Cal.3d 1] is that the assertion of facts contradictory to deposition testimony by affidavit does not constitute ' " '*substantial* evidence of the existence of a triable issue of fact' " ' for the purpose of denying a motion for summary judgment.  A fortiori, trial testimony simply contradicting a clear and unequivocal admission in a deposition cannot require denial of a nonsuit." (*Mikialian*, *supra*, 79 Cal.App.3d at p. 161.)

inference, or uncertain memory, but as a considered circumstance of the case, his adversary is entitled to hold him to it.' " (*Mikialian*, at p. 162.)

Unlike the plaintiff in *Mikialian*, at trial, Coil explained his assertedly contradictory deposition testimony and why it was not inconsistent with his trial testimony, namely, that he gave three contractual reasons in the letter, but that the letter's tone and content raised issues as to Miller's integrity and trust. This, again unlike the circumstances in *Mikialian*, "created a fact issue" (*Mikialian*, *supra*, 79 Cal.App.3d at p. 160) for the jury to decide and to assess Coil's credibility in so doing. As indicated, the agreement permitted Verizon to terminate Miller's agreement if, in "[Verizon's] reasonable discretion" Miller engaged in "unethical, misleading, or unfair business practices" or he had made untrue representations in connection with the agreement. Coil explained that the basis for Miller's termination under this provision was that Miller had engaged in repeated violations by continuing to sell on the Internet after being warned not to do so, exhibiting a lack of integrity, and that as a result Coil had lost trust and confidence in him. Coil testified this is what he "continually" told Miller and Caffagni during the December 29, 2009 meeting. Coil's deposition testimony did not amount to a " 'concrete fact' " on a single issue but rather involved his judgment and perception of how Miller conducted himself. Nor is this a situation where Coil had made a clear concession that he was attempting to contradict at trial. *Mikialian* is inapposite.

The issue for purposes of JNOV is whether the record contains substantial evidence in Verizon's favor, accepting as true the evidence supporting the verdict, disregarding conflicting evidence, and indulging in every legitimate inference that may

be drawn "*in support of the judgment.*" (*Taylor v. Nabors Drilling USA, LP*, *supra*, 222 Cal.App.4th at p. 1237, emphasis added.) We " 'view the facts in the light most favorable to the judgment, resolving all conflicts in [Verizon's] favor and accepting all reasonable inferences deduced from the evidence.' " (*Ibid*.) Under this standard, substantial evidence may still exist even where it is contradicted by other evidence (see *Taylor*, at p. 1237; *Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 119) and it may consist of inferences, as long as such inferences are " 'a product of logic and reason' " and " 'rest on the evidence.' " (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633; *Roddenberry*, *supra*, 44 Cal.App.4th at p. 651.)

Here, the evidence is abundant that Miller had repeatedly violated his contract with Verizon by selling Verizon services over the Internet, misrepresented the status of his Internet sales to Verizon after Verizon discovered continued unauthorized sales, and that Coil finally advised Miller he had lost trust in him and determined he lacked integrity, justifying Miller's immediate termination. Miller has not shown, either by the agreement's terms or legal authority, that Coil or any other Verizon representative was required to specify the contractual provisions under which it was terminating Miller's agreement. On this record, the trial court did not err by denying Miller's motion for JNOV.

DISPOSITION

The judgment and postjudgment orders are affirmed.


                                                O'ROURKE, J.

WE CONCUR:


BENKE, Acting P. J.


HALLER, J.